[Civ. No. 3579. Fourth Dist. Feb. 20, 1948.]

HAZEL M. CLEMENTS, as Administratrix, etc., Respondent, v. R. P. RANKIN et al., Appellants.

Mack & Bianco for Appellants.

T. R. Claflin for Respondent.

GRIFFIN, J.—Action to recover real estate commission. Respondent, a real estate broker, hereinafter referred to as plaintiff, brought this action to recover from the defendants and appellants $1,300 on a claimed written agreement of defendants to pay a commission for the sale of real and personal property after the purported sale had been rescinded by the grantor and grantee by mutual consent. Since judgment was entered plaintiff died and his wife was substituted as administratrix of his estate.

Defendants owned a furnished auto court, a service station, and store equipped with certain stock and cases of beer, and also owned a license to dispense beer at those premises.

Defendants had listed their property for sale with plaintiff for $31,500. On November 8, 1945, Mr. and Mrs. Stone noticed an advertisement by the agent offering it for sale. They went to plaintiff's office. Mr. Williams, a salesman in that office, was sent with them to see the property. They went to the courts and looked over the premises. It was their understanding, from Mr. Williams, that everything was included in the sale, i. e., furniture, stock of merchandise, and the beer license. They became interested and went back that same night and took an inventory of the property. They then repaired to Clements' office and while there Mr. Rankin called and said if they took the property that night "the stock and all went, if not the stock wouldn't go." The Stones then said they would think it over. The next morning they made Clements an offer of $31,000, which they believed included furniture, stock, real property and the beer license, and gave him their check for $2,500. They told him that since the cafe was unfinished they would take the property "as is," for $31,000, $15,000 down and $100 per month, rather than pay Rankins $31,500 and have them complete the cafe, as agreed. Later, Williams returned the check and stated that Rankins refused the offer. Clements then came to see the Stones and said the Rankins would take $15,000 down and $300 per month. The Stones then told Clements that "absolutely the beer license and stock had to go." Clements came back to them with escrow instructions which he had had drawn up at the title company and which merely described the property being transferred as Lots 25 and 26. No mention was made as to the personal property, beer license or stock in trade. The Stones testified that they were busy painting and did not notice whether the escrow instructions contained a description of the entire property involved, but relied on the statement of plaintiff Clements that it did;

that they signed it, believing that it did; that a few days later Mr. Stone went out and talked to Mr. Rankin and discovered that the beer license and stock in trade were not supposed to be included and that it was not the Rankins' intention, at any time, to include them; that they went to the title company and asked to see the bill of sale and were told that there was none; that they were shown the escrow instructions and found that no mention was made of the personal property in the escrow agreement; that he went to Clements' office and told him that there was no bill of sale in the escrow; that Clements said "he would get" one; that he told Clements that "no beer license was written down" and Clements said: "I don't know how you are going to get them to sign"; that Stone then said he would not go through with the deal unless the beer license was included; that he went to Rankins' house and told him that if the beer license, stock and fixtures didn't go, they did not want the place; that Rankin told them that the 38 cases of beer, cases of Seven-Up and tobacco stock were not included in the purchase price; that they then went to see Clements; that Clements said: "I will go out and line them up and have everything in A-1 condition." As a result of the misunderstanding the Rankins and the Stones mutually agreed to "call it all off." They went to the title company, signed a cancellation agreement and stopped payment on the $2,500 check given to the plaintiff. Mrs. Stone then testified that thereafter Mr. Clements offered to buy them a beer license but they did not know whether or not he would be able to obtain one; that "we understood we would get that one"; that at all times they were willing to take the property if the defendants would have sold the real property described in the escrow agreement, the property specified in the inventory, and the beer license. The inventory was placed in evidence and it included everything mentioned except the beer license.

Clements testified that he submitted the escrow instructions to defendants, at their place of business; that there was nothing said to him by defendants about the beer license as to whether or not it was a part of the property to be sold; that defendants signed the escrow instructions as prepared, which instructions contained a provision that the title company was authorized to pay him, as commission, $1,300, and to pay certain costs of escrow. On that same day the Stones and the defendants signed a standard form of deposit receipt for $2,500, prepared by plaintiff, which receipt described the property which the

Stones agreed to buy only as Lots 25 and 26. It also contained the provision:

"I agree to sell the above described property on the terms and conditions herein stated and agree to pay the above signed agent as commission the sum of Thirteen Hundred and No/100 Dollars, or one-half of the deposit should same be forfeited by purchaser, provided said amount shall not exceed the full amount of said commission.

R. P. Rankin<br>
Lillian Rankin<br>
Seller.''

Clements then stated that on November 10, 1945, he went to the Rankins' home to have them sign a bill of sale and he, Rankin, said he was not going to sign it because Clements had "misrepresented this thing," i. e., something about the seller having to pay cost of title certificate; that Rankin called a man working there to "come and throw me out." Clements admitted that a few days before, and on the day following the cancellation of the escrow instructions, he met the Stones and they "made some talk" about not getting the license; that he told them that if they did not get Rankins' license he would get one for them. He admitted on the stand that he had told the Stones, before going into escrow, that everything in the inventory and "everything that was there (at Rankins) went" and "if it didn't, the deal didn't go over"; that he didn't remember whether he specifically mentioned the beer license but "it might have been." On cross-examination Clements admitted he talked with the Stones shortly before the escrow instructions were signed by them, and gave the following testimony:

"Q. (By Mr. Bianco) And they told you if they couldn't get the beer license they wouldn't go through with the deal? A. That is what I am telling you, if they didn't get it they wouldn't have to go through with the deal. . . . Q. Isn't it a fact Mr. and Mrs. Stone insisted the deal wouldn't go through unless they got the beer license? A. They didn't want the deal at all unless it went as it was represented. Q. That included the beer license? A. As far as I know, yes. . . . Q. . . . I am asking you whether or not it isn't a fact that the Stones at all times prior to the signing of the escrow instructions insisted that they had to have the beer license? A. I will answer you the same way, they didn't specifically say beer license, they said everything that was there. Q. This is on your deposition,

page 12. Do you remember the time your deposition was taken in our office? A. Yes. Q. At that time you were asked this question, page 12, line 6, 'Did you talk to Mr. and Mrs. Stone about the beer license before the escrow instructions were signed? A. Yes. Q. What did you tell them? A. I told them if they could not get a beer license the deal would not go through. Q. You told the Stones if they could not get a beer license the deal would not go through? A. Yes.' Q. Do you remember giving those answers? A. At the time I made the deal with them out there. Q. This is before the Stones signed the escrow instructions. A. I can't recall that, no. . . . Q. Now then isn't it a fact that as far as the Rankins were concerned you didn't know at any time throughout this transaction whether the Rankins would or would not transfer their beer license? A. No, that isn't a fact. Q. I will call your attention again to your deposition, page 15, lines 5 to 11, you were asked these questions: 'Q. As a matter of fact, you know the parties never got together on the beer license as to whether Rankin would sell it, and whether Stone was going to get it? A. As far as the beer license is concerned, I don't know whether Rankin ever intended to give it to him or not, but I do know I went to the Board of Equalization and asked about getting one for them, and the man said I could get one.' Q. Did you give that answer at that time? A. I guess I did if you have it down there. Q. As far as you know you didn't know whether the Rankins were willing to give up the beer license? A. I know they told me they would deliver what they had there. Q. They never mentioned beer license to you? A. No. . . . Q. And that took place the day you had the bill of sale prepared and went out there to get it signed, is that right? A. That was when the conversation took place is when I went out there to get it signed. Q. And they refused to sign the bill of sale? A. That is right. Q. And as part of that same conversation didn't they tell you at that time that they would not transfer the beer license, Mr. and Mrs. Rankin? A. At that time I took the bill of sale out there? Q. Yes. A. No, they didn't tell me that. . . . Q. Calling your attention to your deposition on page 13, lines 9 to 12: 'Q. They had not told you they would not transfer the beer license? A. I don't think they said a thing about whether they would or would not, until after I went out there to give him the bill of sale.' Q. Does that refresh your recollection any as to whether they told you at that time they would not transfer it? A. My recollection of that bill of sale and beer license was that they never mentioned it

at no time. . . . Q. In the deposit receipt there is nothing said about personal property to be sold, is there? A. I don't think so. Q. That is likewise true of the escrow instructions, isn't it? A. I don't think there is anything in there either. Q. Was that intentionally omitted by you? A. No, it was not. Q. Why didn't you include it? A. That I don't know, I can't say why it wasn't included because my intention was having it in there. Q. You knew the Stones were insisting on that personal property? A. Certainly. Q. And you knew that the Rankins were arguing with them about it, didn't you? A. No. . . . Q. . . . did you at any time after you made the other deal for $31,000.00 tell Mr. and Mrs. Rankin that for $31,000.00 they were selling the furniture, stock in trade and beer license? A. Selling everything we agreed to at the start. Q. When did you tell them that? A. When I went out there to sign the instructions. Q. Why didn't you include it in those instructions? A. I can't say why I didn't.''

The Rankins then testified that the $31,000 deal was offered for one night only and that the $31,500 deal was not intended to cover the property in the inventory; that they never told Williams or Clements that the $31,500 deal included all of the property in the inventory plus the beer license; that they only intended to sell Lots 25 and 26 as described in the escrow instructions for $31,000; that the only time personal property was ever mentioned was when Clements asked them to sign the bill of sale and they refused.

Upon this evidence the trial court found that prior to November 9, 1945, plaintiff entered into the service of defendants, as agent, to dispose of Lots 25 and 26; that plaintiff negotiated the sale of said property upon the terms and conditions agreed upon by them; that the purchaser procured by plaintiff was ready, able and willing to complete the purchase of defendants' property upon the terms and conditions fixed; that on November 9, 1945, defendants agreed in writing to pay plaintiff $1,300 for such service; that plaintiff has duly performed all of the conditions of said contract on his part to be performed; that plaintiff has not been paid said sum and that it is not true, as claimed by defendants, that said agreement is invalid under section 1973 of the Code of Civil Procedure. Judgment was entered accordingly. Defendants appeal.

It is argued that there was no independent contract of employment of plaintiff as the agent of defendants except an order to pay a real estate broker's commission of $1,300, found

in the escrow instructions of which the deposit receipt was a part, and therefore the broker's right to a commission falls with a rescission of the respective agreements, citing *Irwin* v. *Klimper,* 56 Cal.App. 434, 435 [205 P. 714], and the rule stated in *Dowds* v. *Armstrong,* 17 Cal.App.2d 485 [62 P.2d 411, 63 P.2d 1114], to the effect that where an agreement to pay a commission from the proceeds of the sale is contained in the agreement between the owner and the purchaser and there is no separate enforceable contract of employment the right of a broker to a commission is terminated with the rescission of the agreement between the owner and the purchaser.

It appears from the evidence that there was a separate contract of employment by defendants contained in the standard form of deposit receipt whereby defendants agreed to pay plaintiff a commission of $1,300. Neither that document nor the escrow instructions provide that the commission was to be paid only from the purchase price if and when the sale was completed. Under these circumstances the case comes well within the rule stated in *Deeble* v. *Stearns,* 82 Cal.App.2d 296 [186 P.2d 173], and, if there is sufficient evidence to support the finding that plaintiff, in good faith, fully performed all conditions on his part to be performed, and obtained a valid and binding contract of sale signed by all the parties, the judgment must be sustained.

In support of the contention that there is no substantial evidence supporting this finding, the rule laid down in *Naylor* v. *Ashton,* 20 Cal.App. 544, 546 [130 P. 181], is cited to the effect that:

"The duty assumed by the broker is to bring the minds of the buyer and seller to an agreement for a sale, and the price and terms on which it is to be made, and until this is done his right to commission does not accrue."

*Hicks* v. *Christeson,* 174 Cal. 712, 717 [164 P. 395]; and *Colton* v. *O'Brien,* 217 Cal. 551, 553 [20 P.2d 43], are also cited.

It is argued that this is simply a case of an over-anxious real estate agent who was willing to promise anything to get some kind of a contract signed without actually bringing the parties together, and that the minds of the sellers and purchasers never actually met; that it follows, therefore, that the broker, having undertaken to bring about the execution of a binding agreement and having failed in his undertaking, has not earned his commission and that the evidence does not support the finding

that the broker performed all of the provisions of the contract on his part to be performed.

Opposed to this contention plaintiff cites the general rule laid down in *Twogood* v. *Monnette,* 191 Cal. 103 [215 P. 542], to the effect that a broker employed to sell real or personal property has earned his commission when he has produced a person who is ready, able and willing to purchase the property on the terms satisfactory to the seller and has obtained a binding and valid contract for a sale on the terms proposed by the seller, or has brought the seller and buyer together and thus enabled them to enter into a contract of sale, or has produced such a purchaser who has verbally accepted the seller's terms and who has offered to enter into a written contract embodying the same terms and binding upon both parties. In such cases the broker's right to a commission accrues when the contract of sale is executed, or when opportunity to make such contract is given the seller, and the broker becomes entitled to his commission even though the seller is unable or unwilling to complete the sale. (See, also, *Walter* v. *Libby,* 72 Cal.App. 2d 138, 142 [164 P.2d 21].)

The only evidence supporting plaintiff's argument that he found a purchaser ready, able and willing to purchase on the terms fixed by the seller must be predicated upon the signed agreements in evidence. From an examination of those agreements the sellers agreed to sell, and as they contended, for the price of $31,000, only the real property therein described, i. e., Lots 25 and 26. There is nothing in those contracts that would bind the sellers to include furnishings, stock in trade, or a beer license. The agreement, as signed by the proposed purchasers, provided that they were obligated to purchase Lots 25 and 26 for $31,000 and without fixtures, furnishings, stock in trade, or a beer license. It clearly appears from the uncontradicted evidence that this was not the agreement intended to be signed by the purchasers or as the agent Clements, the plaintiff herein, intended. Even under the agent's uncontradicted testimony, and that of the prospective purchasers, the plaintiff would not have been able to enforce that agreement to purchase, as written, against the purchasers. Under the circumstances, it cannot be said that there was a meeting of the minds of the parties to be bound. When the Stones discovered that the Rankins never intended to convey the personal property above mentioned, and that under the written agreements, the Rankins could not be compelled to do so, and since Clements could not deliver title to the property, as rep-

resented by him, they had the right to rescind. The representations which gave rise to the right to rescind were made by Clements himself. The Rankins recognized this fact and instead of endeavoring to bring an action upon the agreement, which agreement the evidence conclusively shows would have been unenforceable, they should not now be obligated to pay a commission claimed to have been earned under the circumstances disclosed by the uncontradicted evidence here produced.

There is no evidence of any conspiracy between the grantor and grantee to cancel the escrow and to transfer the property by some other means or at a later date to avoid paying a commission. (*Gunn* v. *Bank of California,* 99 Cal. 349 [33 P. 1105] ; *Mattingly* v. *Pennie,* 105 Cal. 514 [39 P. 200, 45 Am. St. Rep. 87] ; *Mott* v. *Minor,* 11 Cal.App. 774, 779 [106 P. 244] ; *Douglas* v. *Spangenberg,* 23 Cal.App. 294, 296 [137 P. 1103] ; *Massie* v. *Chatom,* 163 Cal. 772, 776 [127 P.56] ; *Colton* v. *O'Brien, supra.*)

For the reasons expressed the judgment is reversed.

Barnard, P. J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied April 19, 1948.